**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 21-cv-02230-NYW-SP

STEVEN STRAUGHEN,
RICHARD WILLIAMS, and
ASHLEY STRAUGHEN,

      Plaintiffs,

v.

BHS, INC., a/k/a BHS, INC. OF WYOMING,

      Defendant.

---

## ORDER ON MOTIONS TO EXCLUDE

This matter comes before the Court on two motions filed by Plaintiffs: (1) the Motion to Exclude Certain Testimony by Expert Barry A. Cole at Trial ("Motion to Exclude Cole"), [Doc. 71, filed January 16, 2023]; and (2) the Motion to Exclude Certain Testimony by Defendant BHS, Inc.'s Expert Randolph J. Harris at Trial ("Motion to Exclude Harris" and, collectively, the "Motions to Exclude" or "Motions"), [Doc. 72, filed January 26, 2023].    For the reasons that follow, the Motion to Exclude Cole is **GRANTED IN PART and DENIED IN PART**; and the Motion to Exclude Harris is **GRANTED IN PART and DENIED IN PART**.

## BACKGROUND

This action arises from a water storage tank explosion that caused injury to Plaintiffs Steven Straughen ("Mr. Straughen") and Richard Williams ("Mr. Williams" and collectively with Mr.

Straughen, "Plaintiffs")[1] on or about December 12, 2019, at the Simpson Pad 26 oil and gas production site located in Weld County, Colorado (the "Site"). [Doc. 26 at ¶¶ 15, 51–52]; *see also* [Doc. 23 at 2–3]. The Site was operated by Edge Energy II LLC ("Edge"), which, in turn, hired Skyline Well Testing, LLC ("Skyline") "to assist with flowback operations on the Site, which entailed monitoring and operating all equipment on the Site in order to ensure production of a mixture of water, oil, and natural gas vapors ('Produced Fluids') from the wells on the Site." [Doc. 26 at ¶¶ 15–16].

Plaintiffs were employed by Skyline. [*Id.* at ¶ 41]. Defendant BHS, Inc. a/k/a BHS, Inc. of Wyoming ("BHS" or "Defendant") "provide[d] the water and oil storage tanks used for the Site." [*Id.* at ¶ 19]. In the operative Second Amended Civil Complaint and Jury Demand ("Second Amended Complaint"), Plaintiffs allege, *inter alia*, that the tanks were defective, and that BHS improperly installed them at the Site. *See, e.g.*, [*id.* at ¶¶ 70–72, 114]. Plaintiffs allege they have incurred significant medical expenses related to the accident. [*Id.* at ¶ 12]. They assert claims of negligence, statutory premises liability, and strict liability against BHS, and seek various damages for their injuries. [*Id.* at 8–15].

Relevant to the instant Motions, former Defendant Schneider Summit Services, LLC ("Schneider Summit Services")[2] "retained Barry A. Cole to offer opinions related to his alleged expertise in construction safety," and Defendant BHS "cross-endorsed Mr. Cole." [Doc. 71 at 2];

---

[1] In Response to the Motions, BHS contends that "[w]hile the Motion was ostensibly filed on behalf of all Plaintiffs, it is only signed by Sarah McEahern of Zaner Harden Law, LLP. Ms. McEahern and Zaner Harden Law, LLP only represent Plaintiffs Steven and Ashley Straughen, not Plaintiff Richard Williams." [Doc. 75 at 2 n.1]. BHS correctly notes that Defendant Richard Williams is no longer represented by Zaner Harden Law, LLP, but rather by Timothy C. Galluzzi. [Doc. 50]. Accordingly, this Court **DIRECTS** the Clerk of the Court to **TERMINATE** Zaner Harden Law LLP as counsel for Plaintiffs Steven Straughen and Ashley Straughen.

[2] Pursuant to the Parties' stipulation, the Court ordered dismissal of all claims against Schneider Summit Services on March 10, 2023. *See* [Doc. 79; Doc. 81].

*see also* [Doc. 74 at 2].  Mr. Cole subsequently issued a written report dated September 11, 2022 (the "Cole Report").  *See* [Doc. 71-1].  In addition, BHS "retained Randolph J. Harris to offer opinions related to his alleged expertise in chemical engineering and fire investigation."  [Doc. 72 at 2], and Mr. Harris issued a report dated September 12, 2022 (the "Harris Report"), [Doc. 72-1].  On January 16, 2023, Plaintiffs filed the instant Motions to Exclude, seeking to preclude Mr. Cole and Mr. Harris from offering certain opinions and testimony at trial.  [Doc. 71; Doc. 72].  The Motions are fully briefed and, thus, are ripe for disposition.  *See* [Doc. 74; Doc. 75; Doc. 77; Doc. 78].

## LEGAL STANDARD

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" under the following conditions:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  As noted by the Advisory Committee when the Rule was promulgated, "[a]n intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge."  Fed. R. Evid. 702 advisory committee's note to 1937 rule.  While an expert witness's testimony must assist the jury to be deemed admissible, Fed. R. Evid. 702(a), it may not usurp the jury's fact-finding function.  *See Specht v.*

*Jensen*, 853 F.2d 805, 808 (10th Cir. 1988).  Indeed, "a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms."  *Id.* at 809.  Such testimony "is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function. However, when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed."  *Id.* at 809–10. Testimony that "articulates the ultimate principles of law governing the deliberations of the jury" is inadmissible.  *Id.* at 808.  The line between what is helpful to the jury and what intrudes on the jury's role as the finder of fact is not always clear, but it is well settled that "[a]n opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704(a).

It is well established that trial courts are charged with the responsibility of acting as gatekeepers of expert testimony to ensure that expert testimony or evidence admitted is not only relevant, but also reliable.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–152 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588–89 (1993).  To fulfill that gatekeeper function, courts within the Tenth Circuit conduct a two-part inquiry.  First, this Court considers whether the expert's proffered testimony has a reliable basis in the knowledge and experience of his or her discipline by conducting a preliminary inquiry into the expert's qualifications and the admissibility of the proffered evidence, i.e., whether the reasoning or methodology underlying the testimony is valid.  *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citing *Butler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232–33 (10th Cir. 2004)).  Second, the Court considers whether the proposed testimony is sufficiently relevant to the issues presented to the factfinder.  *See id.*  The party offering the expert opinion bears the burden of establishing its

admissibility, including the foundational requirements, by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

"Generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). To that end, courts consider the following non-exhaustive factors in analyzing whether a particular expert opinion meets the requirements of Rule 702, *Daubert*, and their progeny:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Id*. The Court's analysis is opinion-centric, rather than expert-centric. *See United States v. Nacchio*, 608 F. Supp. 2d 1237, 1251 (D. Colo. 2009).

Ultimately, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Id.* (citing *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty.*, 80 F.3d 1074, 1078 (5th Cir. 1996)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## ANALYSIS

### I.      Rule 702 Hearing

Before turning to the substantive analysis of the Motions to Exclude, this Court first briefly addresses whether an evidentiary hearing is necessary to address the Parties' respective arguments. Rule 702 of the Federal Rules of Evidence does not specify a process by which admissibility of expert opinions is to be determined. *See Nacchio*, 608 F. Supp. 2d at 1251. Instead, Rule 104 of

the Federal Rules of Evidence requires a hearing on preliminary questions of admissibility in civil cases "when justice so requires." Fed. R. Evid. 104(c)(3). A trial court is authorized to exercise its discretion to craft a procedure for determining whether opinion testimony is admissible. *See Adamscheck v. Am. Fam. Mut. Ins. Co.*, 818 F.3d 576, 586 (10th Cir. 2016) (observing that the trial court has discretion in how to conduct a *Daubert* analysis); *Nacchio*, 608 F. Supp. 2d at 1255 (same). Thus, "[w]hile a party may request a *Daubert* hearing, it is within the Court's discretion to determine whether a hearing is necessary." *A.R. by Pacetti v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, No. 12-cv-02197-RM-KLM, 2013 WL 5463518, at *10 (D. Colo. Sept. 30, 2013).

In applying these principles, this Court finds that an evidentiary hearing will not materially assist in resolving the Motions. First, neither Party addresses a specific need for an evidentiary hearing. *See* [Doc. 71; Doc. 72; Doc. 74; Doc. 75; Doc. 77; Doc. 78]. Upon review of the Parties' submissions and the applicable case law, this Court finds that it can appropriately discharge its gatekeeping functions without such hearing and make the requisite findings based upon the written record before the Court. The Court now turns to considering the Motions to Exclude substantively.

## II.     Motion to Exclude Cole

Plaintiffs first seek to exclude certain testimony by Mr. Cole regarding 10 opinions in the Cole Report. [Doc. 71]. The Court will address the opinions in turn.

### A.     Opinions Regarding Causation: Opinions #1 through #7

Plaintiffs first identify seven opinions by Mr. Cole regarding possible causes of the explosion, as follows:

> **Opinion #1:** "My opinion is that a more likely scenario was some ignition source, and combustible mixture of fuel and air (oxygen) met at the point of the entrance to the top of the tanks, immediately prior to the explosion. The damage found to the flame arrester is likely a separate coincidental ongoing process that didn't result in the explosion." [Doc. 71-1 at 5, ¶ 4].

**Opinion #2:** "Employees carried in Class 1, Division 1 and 2 explosive, flammable and/or combustible gas potential and presence, cap lights, and telephones that were not permissible []under MSHA, nor approved/rated (similar rating – under OSHA) for going into such an area." [*Id.* at 6, ¶ 5(b)].

**Opinion #3:** "In the alternative an electrical ignition source was introduced into a flammable atmosphere from the employee(s') cap lights that are not rated or approved/permissible for the hazardous atmosphere, a phone, and or phone light if one was being used or was turned on by either worker." [*Id.* at 8, ¶ 6].

**Opinion #4:** "It isn't demonstrated that the rubberized/vinyl/poly sheeting used for the containment is or isn't static resisting, conductive, or potentially creating static. It is unknown whether the synthetic fire rated coveralls, made, usually of synthetics are able to create static when worn over other clothing that may create static when the two fabrics interact, or whether the clothing can create static while the employees have to slide their bodies across the barrier of the containment that is lined with the sheeting." [*Id.* at 6, ¶ 5(k)].

**Opinion #5:** "It is my opinion that a static charge is likely introduced to a flammable atmosphere (likely a plume/discharge from or near the end of the catwalk on water tank #4,) either on the person of Williams, attending to a valve, or more likely introduced on the person of Straughen at the point of the first (seemingly) explosion." [*Id*. at 8].

**Opinion #6:** "If an overpressure event occurred inside a tank, and created a breaking or separating metallic parts, welds, or seams, plate steel or deformation and tearing of metal, such physical mechanical action happening to steel could create an ignition source unto itself, by the rubbing or rough metal to metal contact, or abrupt tearing.  The ignition source could be the destruction of the metal tank, creating an ignition and then a second explosion that was not just expanding pressure inside the tank, but actual heat, combustion, explosive propagation." [*Id.* at 14, ¶ 16].

**Opinion #7:** "The plume of explosive gases is able to be ignited by any heat or electrical arc inside any electrical device, or static spark.  If a fire or combustion was initiated inside a vessel that was too low on O2 to create a hot fire, or create a rapid fire, with rapid propagation, it could roil inside. . . . To assume a fire started inside, the vessel is unproven, and just as likely to have been initiated outside, and then traveled to the inside. . . . It is my opinion that any or all of these things could have gone on in this instance, and the amount of Oxygen mixed in is substantially more than a nipple or pinholes, or other minor voids would likely contribute." [*Id.* at 8, ¶ 7].

[Doc. 71 at 3–9].  Plaintiffs challenge Mr. Cole's methodology in forming these opinions, arguing

that the opinions are "speculative" and "unsupported by any evidence or scientific expertise." [*Id.*

at 3]; *see also* [*id.* at 5 ("Essentially, Mr. Cole posits that one causal theory is more likely than the other but then cannot point to any evidence to support his theory. . . .  This is not a reliable method for reaching a conclusion in the world of science (or law)."); *id.* at 6 ("He cannot opine that Plaintiffs were carrying improper items when he has zero information about those items."); *id.* at 7 ("Mr. Cole is just guessing that the Plaintiffs' clothing or shoes caused a static discharge that sparked and caused the tank to explode.  This is not scientific nor based on the evidence in the case.")].  For support, Plaintiffs reference Mr. Cole's testimony reflecting, *inter alia*, that he lacks any evidence "that there was an ignition outside of the tanks"; or knowledge regarding "what kind of cap lights or phones were used by Plaintiffs," or the types of clothes they were wearing.  *See* [*id.* at 4–7]; *see also* [Doc. 71-3 at 86:13–20, 89:10–18, 90:5–17, 98:3–23, 99:7–17, 104:25–106:7].[3]  Plaintiffs also contend that "Mr. Cole is not qualified to offer technical, engineering/fire causation opinions" as he "is not an engineer, and his training in chemistry is limited to college courses."  [Doc. 71 at 9]; *see also* [*id.* at 2 ("Mr. Cole is not a lawyer, OSHA inspector, engineer, or scientist.  Nonetheless, he offers opinions that are both outside his expertise and wholly unsupported by facts or analysis." (citation omitted))].  Plaintiffs further contend that permitting Mr. Cole to testify at trial regarding these opinions will confuse the jury.  *See* [*id.* at 5–6, 8–9].

In response, Defendant argues, *inter alia*, that Mr. Cole's opinions regarding the cause of the explosion are supported by evidence; he "has formal training regarding fires, including their potential causes"; and his "opinions as to the cause of the explosion are intended to help the jury understand why Skyline's [safety] failings mattered."  [Doc. 74 at 4–7].

---

[3] When citing to transcripts, the Court cites to the document number generated by the CM/ECF system but the page and line numbers reflected by the transcript.

The Court respectfully agrees with Plaintiffs, and finds that exclusion of Opinions #1 through #7 is appropriate. In reaching this conclusion, the Court focuses primarily on the first part of the two-step inquiry: Mr. Cole's methodology—that is, whether his opinions have a reliable basis in the knowledge and experience of his discipline, which includes a preliminary inquiry into his qualifications. *See Cook*, 580 F. Supp. 2d at 1082. As noted above, courts consider the following non-exhaustive factors in analyzing whether a particular expert opinion meets the requirements of Rule 702, *Daubert*, and their progeny:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Dodge*, 328 F.3d at 1222.

***Qualifications.*** As an initial matter, Defendant does not claim that Mr. Cole is qualified to render opinions regarding causation in this case; nor does Defendant claim that Mr. Cole was retained for that purpose. *See generally* [Doc. 74]. Instead, Defendant asserts that the "scope of [Mr. Cole's] work for this case was regarding 'general safety' and 'safety related issues.'" [*Id.* at 4]. Defendant likewise confirms that "Mr. Cole's discussion [of potential causes of the explosion] is not intended to provide an independent causation opinion." [*Id.* at 6]. These descriptions of the scope of Mr. Cole's work in this case are consistent with his deposition testimony:

**Q. Okay. What were you asked to do in this case?**

A. Review the printed materials that was [sic] germane to my specialty and my abilities and render an opinion.

**Q. And when you say germane to your specialty and your abilities, what does that include?**

A. My scope is limited to general safety and not specifically to engineering or the -- or the mathematical side, if you will, of the explosive gases and the functions of the oil and gas site.

**Q.  Okay.  So you were asked to review the documents in this case and then provide opinions related to the general safety?**

A.  Well, the safety -- safety related issues in this case.

[Doc. 71-3 at 44:21–45:11].

Although Defendant does assert that "Mr. Cole has formal training regarding fires, including their potential causes of fires and explosions," [Doc. 74 at 4 (citing [Doc. 71-3 at 41:11–42:21])], the deposition testimony that Defendant cites does not indicate that Mr. Cole obtained specific training or has any experience determining fire causation.  Rather, it reflects that Mr. Cole received *basic* training in "many safety classes . . . about fire, fire protection, [and] fire prevention," including "how does [a fire] start, how does it propagate, how does it hide, how does it react when you see [sic] introduce oxygen.  You know, *the fire triangle and all the basics*."  [Doc. 71-3 at 41:11–22 (emphasis added)].  Mr. Cole also testified that he is not an engineer, and his training in chemistry is limited to college level courses.  [*Id.* at 39:8–25].  In addition, Mr. Cole's lengthy curriculum vitae does not mention anything about his purported experience in causation forensics.  *See generally* [Doc. 71-2].[4]  In sum, the Court is not persuaded that, based on the assertions regarding Mr. Cole's qualifications and the purpose for his retention, Mr. Cole is qualified to render opinions regarding the cause of the explosion.

***Methodology and Reliability.***  Moreover, Defendant's response and Mr. Cole's report fail to address his methodology in reaching his conclusions.  *See* [Doc. 74; Doc. 71-1].  "Typically, to

---

[4] What is more, Mr. Cole's *and* Defendant's silence regarding Mr. Cole's alleged experience in causation forensics is notable in light of the contrast between the briefing on the instant Motion to Exclude Cole versus the Motion to Exclude Harris.  Indeed, unlike the Motion to Exclude Cole, the Motion to Exclude Harris attaches exhibits highlighting Mr. Harris's credentials in causation forensics, including an affidavit by Mr. Harris.  *See, e.g.*, [Doc. 75-1 at ¶ 3 ("I am a chemical engineer that specializes in performing investigations to determine the cause and origin of fires and explosions.  I have been involved in investigations for this purpose since 1985."); Doc. 72-2 at 1 ("Mr. Harris is a nationally recognized expert in fire forensics.")].

determine the reliability of expert testimony, courts do not focus on the correctness of the opinion; rather, the proponent of the expert must prove that the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *Two Moms & a Toy, LLC v. Int'l Playthings, LLC*, No. 10-cv-02271-PAB-BNB, 2012 WL 5249459, at *5 (D. Colo. Oct. 24, 2012) (internal quotation omitted). Where, such as here, an expert's testimony is based on experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). Indeed, the Advisory Committee Notes provide that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. "It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant." *Chateau Vill. N. Condo. Ass'n v. Am. Fam. Mut. Ins. Co.*, No. 14-cv-01583-PAB-NYW, 2016 WL 1444626, at *1 (D. Colo. Apr. 13, 2016). Given these principles, courts in this District have noted that "[u]sually, it is necessary for the opponent of the opinion to call its own witness to establish, for example, that the proponent's methodology is not generally recognized in the field, that it has inherent false, [or] that it was not properly applied." *A-W Land Co., LLC v. Anadarko E&P Co., LP*, No. 09-cv-02293-MSK-MJW, 2017 WL 4161278, at *2 (D. Colo. Sept. 20, 2017).

Plaintiffs contend that Mr. Cole failed to apply any reliable methodology in making his causation opinions. *See, e.g.*, [Doc. 71 at 3 ("Mr. Cole offers several speculative opinions

regarding potential causes of the explosion that are unsupported by any evidence or scientific expertise."); *id.* at 4 (arguing that Opinion #1 "is nothing more than his subjective belief, lacking any supportive evidence or methodology to make it reliable"); *id.* at 5 ("Essentially, Mr. Cole posits that one causal theory is more likely than the other but then cannot point to any evidence to support his theory. . . . This is not a reliable method for reaching a conclusion in the world of science (or law)."); *id.* at 6 ("He cannot opine that Plaintiffs were carrying improper items when he has zero information about those items."); *id.* at 7 ("Mr. Cole is just guessing that the Plaintiffs' clothing or shoes caused a static discharge that sparked and caused the tank to explode. This is not scientific nor based on the evidence in the case.")]. In addition, as discussed above, Plaintiffs cite excerpts from Mr. Cole's deposition testimony confirming that he has no evidence to support any of his causation opinions. *See* [*id.* at 4–9 (citing [Doc. 71-3 at 86:13–20, 89:10–18, 90:5–17, 98:3–23, 99:7–17, 106:3–7, 112:2–9, 115:5–10, 181:6–10])].

Defendant does not address Mr. Cole's methodology at all in its response. *See generally* [Doc. 74]. Instead, Defendant contends that "circumstantial evidence" supports "Mr. Cole's conclusions as to potential causes of the explosions." [*Id.* at 6]. Specifically, Defendant insists that "the testimony the Motion relies upon to claim there is no 'evidence' supporting Mr. Cole's causation theories are all testimony regarding <u>physical</u> evidence." [*Id.* at 7]. And because "Mr. Cole is <u>not</u> an attorney," Defendant continues, he "does not appear to understand that circumstantial evidence is evidence." [*Id.*]. Defendant also focuses on whether Mr. Cole's opinions regarding causation will be helpful to a jury. *See* [*id.* at 5–7]. Respectfully, the Court is not persuaded by Defendant's arguments.

First, Defendant fails to call its own expert witness to establish that Mr. Cole employed a methodology in this case that is generally recognized in the field of forensic causation analysis.

*See A-W Land Co.*, 2017 WL 4161278, at *2.   Second, Defendant fails to point to any of the "circumstantial evidence" that purportedly supports Mr. Cole's conclusions.   *See* [Doc. 74 at 5–7]. Third, whether Mr. Cole is an attorney is unrelated to the issue of what methodology he used to reach his conclusions with respect to the cause of the explosion—which, again, Defendant fails to address altogether.   *See generally* [*id.*].[5]   Finally, Mr. Cole's report states that his opinions generally—as opposed to his causation opinions specifically—are based on his experience, as follows:

> The opinions are drawn from my experience, training, exposure, research, education, case work (other cases), as briefly outlined in my CV and Resume, and my many years of exposure to fact and transcripts, and depositions, and witness interviews, written statements, telephone interviews, and other human interactions, and behaviors, as well as my extensive accident reconstruction and accident investigation work.   The opinions are expressed at this juncture as having a high degree of professional certainty, and sound basis, with the understanding that I may be exposed to unseen/new data or testimony, or review prior seen material and in context and in the entirety of what I have seen up to that point, may come to a different understanding of such material (or item) although it is odd for that to happen in any substantive way, in my experience. . . .   I am confident that my opinion will, by and large be what I am relaying to you here.

[Doc. 71-1 at 1].   However, as mentioned above, where an expert's testimony is based on experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."   *Medina-Copete*, 757 F.3d at 1104.   Nothing in the record provides the necessary

---

[5] Moreover, the Court is not persuaded by Defendant's argument that "Mr. Cole is <u>not</u> an attorney" and therefore "does not appear to understand that circumstantial evidence is evidence."   [Doc. 74 at 7].   Indeed, even if this argument bore on the outcome of the instant motion (which it does not), the Court finds it difficult to see how Mr. Cole—who has apparently provided expert testimony for nearly 30 years, *see* [Doc. 71-2 at 8–14]—cannot distinguish between direct and circumstantial evidence even from the perspective of a non-attorney.

connection, and Defendant likewise fails to proffer a declaration or statement by Mr. Cole that clarifies how his experience led him to form the causation opinions in his report.[6]

Accordingly, the Motion to Dismiss Cole is **GRANTED** insofar as Plaintiffs seek to preclude Mr. Cole from testifying regarding causation, as identified in **Opinions #1 through #7**.[7]

### B.      Opinions Offering Legal Analysis: Opinion #8

Next, Plaintiffs challenge an opinion by Mr. Cole that references workplace safety standards issued by the Occupational Safety and Health Administration ("OSHA"):

> **Opinion #8:** "Using OSHA standards as the standard of care, which are ubiquitous, long been in existence, well explained and widely known and accepted in USA, in virtually all covered industries, which is similarly explained and widely known and accepted in MSHA covered sites - if applicable, there is never a time when the direct employer of the employees that are exposed to any hazards, is less culpable, and less responsible to determine, in advance, in so far as possible, all recognizable and foreseeable hazards that may affect its employees." [Doc. 71-1 at 11, ¶ 10].

[Doc. 71 at 9–10]. Plaintiffs argue that, in so opining, "Mr. Cole attempts to usurp the function of the court" by discussing the relative "liability of the employer compared to other subcontractors

---

[6] It is also unclear that the section of Mr. Cole's report describing the "experience" on which he based his opinions relates to this case specifically—as opposed to boilerplate language that is included in the introduction of other similar reports that he writes—given that he fails to specify this case or any of the documents that he purportedly reviewed. *See* [Doc. 71-1 at 1–2 (stating, for instance, that "[i]t is more likely than not that I will review material that I only briefly reviewed to date, due to time constraints, and it's such a volume that more information is contained in that bulk of information")].

[7] Although the Court does not substantively address whether Mr. Cole's proposed causation testimony is relevant to the issues presented to the factfinder, the Court nevertheless notes that Defendant's relevance argument also does not support its position that Mr. Cole should be permitted to testify on this issue. Specifically, Defendant contends that "Mr. Cole's discussion of potential causes of the explosion are [sic] intended to explain how the failings of Skyline's safety protocols allowed Mr. Straughen and Mr. Williams to carry ignition sources that <u>could</u> have caused the explosion." [Doc. 74 at 6]. However, notwithstanding Mr. Cole's admissions that he did not employ any reliable method to obtain information regarding the safety issues at the Site that he opines *could have* caused the explosion, Defendant's argument does not make Mr. Cole's opinions regarding safety relevant to the issue of causation. Indeed, contrary to Defendant's position, its arguments suggest that a jury would likely be *more confused* by Mr. Cole's testimony regarding his theories of what *could have* caused the specific explosion in this case.

under OSHA standards" and defining the standard of care in this case. [*Id.* at 10 (arguing that Mr. Cole's opinions "improperly define the standard of care and imply that Plaintiffs' employer is per se 'more culpable' than any other party or non-party, regardless of their conduct")].

In response, Defendant cites *Specht v. Jensen*, where the Tenth Circuit observed that an expert "may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible." *Specht*, 853 F.2d at 809; *see* [Doc. 74 at 7]. However, as Defendant acknowledges, the *Specht* court also explained that "when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed. In no instance can a witness be permitted to define the law of the case." *Specht*, 853 F.2d at 810; *see also* [Doc. 74 at 7]. This is precisely what the above-referenced portion of Opinion #8 seeks to do here—that is, define the law of the case. Indeed, one of Defendant's affirmative defenses against Plaintiffs is that its liability, "if any, may be barred or diminished by [Plaintiffs'] own comparative negligence and/or the acts or omissions of third parties over whom BHS had no responsibility or authority to control." [Doc. 28 at 23]; *see also, e.g.*, [Doc. 23 at 3]. And, in the Cole Report, Mr. Cole opines that pursuant to OSHA standards, "there is never a time when the direct employer of the employees that are exposed to any hazards, is less culpable, and less responsible to determine, in advance, . . . all recognizable and foreseeable hazards that may affect its employees. *The result is that there are no other entities on site that are more accountable for compliance and protection of the employees' health and safety than Skyline*." [Doc. 71-1 at 11, ¶ 10 (emphasis added)]. This opinion by Mr. Cole constitutes an "inva[sion] of the [C]ourt's authority by discoursing broadly over the entire range of the applicable law" regarding the relative liability, if any, between Defendant and Plaintiffs' employer, Skyline, which the Tenth Circuit has rejected as improper expert witness testimony. *Specht*, 853 F.2d at 809. Thus, this Court will

preclude Mr. Cole from testifying that "[t]he result is that there are no other entities on site that are more accountable for compliance and protection of the employees' health and safety than Skyline." [Doc. 71-1 at 11, ¶ 10].

Nevertheless, Defendant also insists that "Mr. Cole's anticipated testimony regarding OSHA standards as it relates to Skyline's liability" is "admissible to aid the jury in understanding the injury standards that Skyline was operating under." [Doc. 74 at 8]. For support, Defendant relies upon the Colorado Supreme Court's holding that "once a trial court determines that a defendant could owe a plaintiff a duty under Colorado law, the jury should be permitted to hear evidence of OSH Act regulations as some indication of the standard of care with which a reasonable person in the defendant's position should comply." *Scott v. Matlack, Inc.*, 39 P.3d 1160, 1170 (Colo. 2002); *see also* [Doc. 74 at 8]. Given Mr. Cole's apparent expertise in workplace safety issues, and the principle that "rejection of expert testimony is the exception rather than the rule," Fed. R. Evid. 702 advisory committee's note to 2000 amendment, the Court finds it proper to permit Mr. Cole to testify generally regarding OSHA standards at the Site to the extent they relate to the liability issues in this case. He will not, however, be permitted to testify as to the liability of Skyline under such standards. Because the scope of Mr. Cole's prospective testimony regarding OSHA standards is unclear; and insofar as Mr. Cole's testimony conflates the issues of OSHA standards generally with the liability standards upon which the jury's verdict will be based, the Court finds it appropriate to resolve any potential issues at trial.

Accordingly, the Motion to Exclude Cole is **GRANTED IN PART** as to **Opinion #8** insofar as Plaintiffs seek to preclude Mr. Cole from testifying regarding the relative liability of the parties or non-parties in this case; and **DENIED IN PART** insofar as Plaintiffs seek to preclude

Mr. Cole from testifying regarding OSHA standards generally, subject to any objections to such testimony at trial.

### C.    Opinions Regarding the Quality of OSHA Investigations: Opinions #9 and #10

Next, Plaintiffs seek to exclude the following opinions by Mr. Cole regarding the credibility or quality of OSHA's investigation of the explosion Site:

> **Opinion #9:** "The presence of an OSHA report is generally not a final or conclusive fact set for me, since their expertise, and ability to work within a tight time frame and produce a comprehensive report is nil.  There [sic] inspectors are not science based, or necessarily very well trained in accident investigation, transcribing, and verifying meanings, or understanding the many different industries they have to work in each week.  They often have no prior experience of an operation they are sent to investigate.  Their prime motivation is to find some likely violations (hopefully having something to do with an incident, but not at all necessary that it be causative or even related)."  [Doc. 71-1 at 2].

> **Opinion #10:** "It is very common that OSHA, and other officials are incorrect at the early stages of investigations, and writing reports simply based on time, and resources.  Also, expertise in standards, as mentioned above does not make them experts in the reality of the industry in the field."  [*Id.*].

[Doc. 71 at 11].  According to Plaintiffs, these opinions represent "broad sweeping generalizations" regarding OSHA investigations based on "other unspecific cases" that are not before this Court, and they argue that "Mr. Cole's claims that the OSHA inspectors are not qualified or well-trained is not derived from his review of the OSHA report, his knowledge or experience with the inspector, or any other facts in this case. Instead, they are speculative and unsupported." [*Id.*].  For support, Plaintiffs cite Mr. Cole's testimony reflecting that he did not investigate the OSHA inspectors' backgrounds, education, or training they received prior to inspecting the Site; he was not aware whether the OSHA inspectors at the Site had any special expertise related to the explosion; and generally had no knowledge about any of the inspectors, including their names.  [*Id.* at 11–12]; *see* [Doc. 71-3 at 57:9–16, 58:2–12, 61:8–9].

The Court agrees that Mr. Cole should be precluded from testifying regarding Opinions #9 and #10. Notably, Defendant fails to dispute Plaintiffs' arguments or the evidence establishing that Mr. Cole's opinions regarding the OSHA report in this case are not based on anything in that report or the facts specific to this case. *See* [Doc. 74 at 8–9].[8] Instead, Defendant insists that "OSHA issued conclusions regarding the cause of the explosion" and "Plaintiffs have relied on these conclusions" in this case. [*Id.* at 8]. Defendant also urges that Mr. Cole's opinion regarding OSHA investigations generally "would be helpful to the jury because[] the jury may otherwise see the OSHA reports as definitive conclusions as they were issued by the governmental entity charged with workplace safety." [*Id.*]. Thus, Defendant continues, "Mr. Cole's opinions regarding these typical OSHA processes will help the jury assess the credibility of the OSHA reports and give the conclusions the appropriate weight during deliberations." [*Id.* at 8–9].

This Court respectfully disagrees. General opinions regarding OSHA, its functioning, and the accuracy and credibility of OSHA reports that are not specific to this case are simply not relevant, i.e., they do not have the tendency to make a fact more or less probable than it would be without the evidence, and the accuracy or credibility of the OSHA report is not a fact of consequence in determining the action. *See* Fed. R. Evid. 401. Even disregarding for the moment that the accuracy or credibility of the OSHA report is *not at issue* in the instant Motion to Exclude Cole, Defendant's attempt to use the Cole Report to dispute OSHA causation findings is improper. As discussed above, Defendant fails to establish that Mr. Cole is qualified—including whether he

---

[8] Defendant claims that "Mr. Cole's report contains opinions regarding the manner in which OSHA investigations are generally performed and how this investigation in particular was performed." [Doc. 74 at 8]. However, Defendant fails to cite any evidence to support this position, let alone to refute Mr. Cole's own testimony that he did not look into the background of any of the OSHA investigators that he claims conducted an inadequate investigation at the Site. *See* [Doc. 71-3 at 57:9–16].

used any reliable methodology—to render any opinions regarding causation in this case.  *See, e.g.*, [*id.* at 4 ("Mr. Cole's scope of work for this case was regarding 'general safety' and 'safety related issues.'"); *id.* at 6 ("Mr. Cole's discussion is not intended to provide an independent causation opinion.")].  Accordingly, the Motion to Exclude Cole is **GRANTED** insofar as Plaintiffs seek to exclude Mr. Cole from testifying regarding the credibility or quality of OSHA's investigations generally or specifically in this case, as identified in **Opinions #9 and #10**.

For the reasons discussed above, Plaintiffs' Motion to Exclude Certain Testimony by Expert Barry A. Cole at Trial [Doc. 71] is **GRANTED IN PART and DENIED IN PART**, as follows:  Mr. Cole may testify as to **Opinion #8** insofar as that opinion relates to OSHA standards generally, subject to any objections on such testimony at trial; and he is precluded from testifying at trial regarding **Opinions #1 through #7**; **Opinion #8** insofar as that opinion references the relative liability of the Parties or non-parties in this case; and **Opinions #9 and #10**.

### III.    Motion to Exclude Harris

Plaintiffs also move to exclude certain opinions by Randolph J. Harris, which are contained in the Harris Report, dated September 12, 2022, [Doc. 72-1], and also include statements made at his deposition, *see* [Doc. 72-3].  In his report, Mr. Harris explains that he was assigned to, *inter alia*, review various investigative reports, letters, and forms from OSHA, the Weld County Sheriff's Office, the Colorado Oil and Gas Commission, as well as the Skyline Incident Summary Report, among others; review depositions transcripts and exhibits; review photo and video footage of the Site; attend "group examinations" in July 2020 and March 2022; and "conduct[] testing on the subject flame arrester" in May 2022.  [Doc 72-1 at 1–2].  Based on his investigation, Mr. Harris concluded, *inter alia*, that "the subject explosion was caused by the faulty flame arrester" that was

"substantially melted, to the point that it could no longer stop the incinerator flames from entering the upstream flammable gas in the vent piping and overt the tanks." [*Id.* at 2].

In the instant Motion, Plaintiffs identify 12 opinions that they seek to exclude on the grounds that Mr. Harris (1) "offers opinions outside his expertise, including legal conclusions related to spoliation and Skyline's liability, as well as opinions related to the flowback system and oil and gas industry standards"; (2) "relay[s] the opinions of others and bolster[s] those opinions without any independent analysis or research"; and (3) "admitted in his deposition that some of his opinions are incorrect, such that they should be withdrawn." [Doc. 72 at 2].

Defendant counters that Plaintiffs have "misconstrue[d] the basis for [Mr. Harris's] opinions and his deposition testimony," reasoning that "Mr. Harris'[s] opinions do not interpret law but provide opinions as to how an OSHA investigation should proceed and the impact of regulations on the operations at the well site." [Doc. 75 at 2]. Defendant also argues that Mr. Harris made conclusions regarding the cause of the explosion based on his independent investigation, "not merely conclusions of other experts." [*Id.*]. Defendant further claims that Mr. Harris is sufficiently qualified to provide his opinions. [*Id.*]. As discussed below, subject to a few minor limited exceptions, the Court respectfully disagrees with Plaintiffs that Mr. Harris should be precluded from testifying regarding the opinions at issue, each of which the Court addresses in turn below.

### A.   Opinions Regarding Liability and Spoliation: Opinions #1 through #5

Plaintiffs first identify five opinions which they claim represent Mr. Harris's "attempts to usurp the function of the court by drawing legal conclusions about both Skyline's and the OSHA investigators' actions, specifically related to liability and spoliation." [Doc. 72 at 3–4]. Those opinions are as follows:

**Opinion #1:** "Letting Skyline conduct the follow up explosion investigation[] was leaving the fox in charge of the henhouse.  The Skyline report did not assign any liability to their employees."  [Doc. 72-1 at 3].

**Opinion #2:** "Skyline employees altered the scene immediately after OSHA released it.  This prevented others from conducting a complete investigation."  [*Id.* at 5, ¶ 11].

**Opinion #3:** "[I]t was spoliation in my opinion and bad form for [Skyline] to dismantle everything before Garrett Mitchell was there."  [Doc. 72-3 at 162:15–17].

**Opinion #4:** "OSHA prematurely left, and they were -- and they falsely -- they wrongly depended on Skyline to continue the investigation.  Which Skyline spoliated the evidence . . . "  [*Id.* at 169:4–7].

**Opinion #5:** "It is doubtful that there was an open 2″ pipe spewing gas for 12 days; however, if there was, <u>then it was an environmental violation</u>."  [Doc. 72-1 at 5, ¶ 10 (emphasis added)].

[Doc. 72 at 3–4].  Plaintiffs argue that "Mr. Harris is not qualified as an attorney or legal expert to opine on what constitutes spoliation or liability," and yet "his opinions directly address legal standards rather than facts."  [*Id.* at 4].  Specifically, Plaintiffs contend that "the jury will be tasked with determining whether Skyline, as a designated non-party, was negligent in causing Plaintiffs' injuries" and, therefore, "[i]t is the court's role to inform the jury of the applicable legal standards that apply to Skyline's conduct."  [*Id.*].  Plaintiffs add that "no parties in this case have alleged spoliation, so it [is] not an issue for the jury."  [*Id.*].

In response, Defendant argues that "the legal standards that the jury must base their verdict upon are generally negligence principles," but "[t]he claims do not ask the jury to determine if any environmental regulations have been violated or if any party has spoliated evidence."  [Doc. 75 at 4].  Thus, Defendant continues, Mr. Harris's "testimony regarding the various regulations that were in effect and the OSHA investigation are relevant facts for the jury to consider when determining if the defendants and/or Skyline breached their relevant standards of care."  [*Id.*].  Defendant also argues that Mr. Harris does not form any legal opinions regarding spoliation.  [*Id.* at 5].

The Court finds it inappropriate at this juncture to preclude Mr. Harris's testimony regarding Opinions #1 to #5. As an initial matter, despite Plaintiffs' reference to Mr. Harris's lack of qualifications "as an attorney or legal expert," *see* [Doc. 72 at 4], Plaintiffs do not challenge Mr. Harris's qualifications as a fire, explosion, and carbon monoxide forensics expert. *See generally, e.g.*, [Doc. 72-2 (Harris CV)]. As BHS points out, Mr. Harris has been involved in thousands of investigations in his professional career, including over 350 investigations at oil and gas well sites. [Doc. 75 at 2 (citing [Doc. 72-2])]. As a result, this Court concludes that it is within his scope of expertise for Mr. Harris to testify as to industry standards regarding the conduct of investigations and the preservation of evidence in the context of such investigations. Thus, it appears that Plaintiffs' challenge to Opinions #1 to #5 are not based on Mr. Harris's methodology or the scientific validity of his approach, but on Plaintiffs' disagreement with his conclusions. This disagreement is not a basis for exclusions. *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005) (observing that a trial court's focus should not be upon the precise conclusions reached by the expert, but upon the methodology employed in reaching the conclusions and finding that it is a generally acceptable practice for a fire investigator to observe the scene of an accident).

With respect to Opinions #1 to #4, the Court does not construe Mr. Harris's opinions as providing legal standards regarding "spoliation or liability," as Plaintiffs suggest. [Doc. 72 at 4]. Rather, Mr. Harris summarizes a portion of Skyline's investigation report related to the explosion. Indeed, in his report, Mr. Harris explained that after OSHA investigated the explosion Site, "Skyline immediately started dismantling the vent pipes and fittings" on the storage tanks, which occurred *before* BHS could "perform [its] investigation." [Doc. 72-1 at 3]. As a result, Mr. Harris opined:

>[l]etting Skyline conduct the follow up explosion investigation[] was leaving the fox in charge of the henhouse. *The Skyline report did not assign any liability to their employees. They blame BHS for openings in the tanks, and the flame arrester.*

[*Id.* (emphasis added)]. And, assuming Skyline's investigation report indeed failed to "assign any liability to their employees" and placed material blame for the explosion on BHS—which Plaintiffs do not dispute, *see* [Doc. 72; Doc. 78]—the Court does not find that Mr. Harris's factual summary of Skyline's investigation report constitutes an opinion as to spoliation or liability. Indeed, as acknowledged by both sides, the issue of legal spoliation does not appear to be at issue in either the action as a whole or Mr. Harris's report. [Doc. 72 at 4; Doc. 75 at 5]. Instead, upon review, this Court concludes that Mr. Harris uses the term "spoliation" in a layperson's sense of the word. Thus, exclusion of Opinions #1 through #4 is unwarranted for the reasons argued by Plaintiffs.

With respect to Opinion #5—"[i]t is doubtful that there was an open 2″ pipe spewing gas for 12 days; however, if there was, then it was an environmental violation," [Doc. 72-1 at 5, ¶ 10]— Plaintiffs argue that Mr. Harris's opinion constitutes "a legal finding" that "Skyline broke some law meant to protect the environment." [Doc. 72 at 5]. Plaintiffs insist that Mr. Harris is not qualified to offer this opinion, and even if he were, "Skyline's alleged violation of the environmental law . . . is not a relevant issue for the jury." [*Id.*]. The Court respectfully disagrees that Opinion #5 constitutes a legal conclusion or that Mr. Harris should be precluded from testifying regarding Opinion #5 at this time.

Notably, again, Plaintiffs do not dispute Mr. Harris's qualifications as an expert in fire, explosions, and carbon monoxide, *see, e.g.*, [Doc. 72-2], and they stress that "[i]n this case, the jury will be tasked with determining whether Skyline . . . was negligent in causing Plaintiffs' injuries." [Doc. 72 at 4]. Relatedly, Defendant asserts that "Mr. Harris'[s] investigations of oil & gas sites have . . . provided insight into how the industry considers and complies with regulations," and therefore Mr. Harris's opinion relates to, *inter alia*, "how environmental regulations could

have impacted Skyline's operations at the [S]ite." [Doc. 75 at 6]. And, as noted above, "a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Specht*, 853 F.2d at 809. Thus, insofar as Skyline's negligence regarding various safety concerns is at issue, Mr. Harris's determination that "an open 2″ pipe spewing gas for 12 days" is an "environmental violation" appears to fall within his field of experience as a "fire, explosion, and carbon monoxide expert." [Doc. 72-2 at 1 (capital letters omitted)]. Moreover, although Plaintiffs cite only a portion of Mr. Harris's statements regarding Opinion #5, *compare* [Doc. 72 at 4] *with* [Doc. 72-1 at 5, ¶ 10], Mr. Harris's assertions surrounding Opinion #5 further establish the relevance between Mr. Harris's reference to "an environmental violation" and Skyline's safety practices and/or capacity to recognize fire hazards related to the explosion in this case:

> It is doubtful that there was an open 2″ pipe spewing gas for 12 days; however, if there was, then it was an environmental violation and an explosion hazard, *which should have been recognized and corrected by Skyline*.

[Doc. 72-1 at 5, ¶ 10 (emphasis added)]. Indeed, Plaintiffs' criticisms suggest challenges to Mr. Harris's data and/or assumptions, but do not address his methodology, and thus go to the weight, rather than the admissibility, of Mr. Harris's opinions. *See Hardy v. Union Pac. R. Co.*, No. 10-CV-01880-REB-MJW, 2011 WL 5295199, at *3 (D. Colo. Nov. 2, 2011) (finding that "[t]o the extent [the expert's] facts and data . . . may be inaccurate, incomplete, or otherwise imperfect, those flaws go to the weight to be ascribed to his opinions, and not to their admissibility.")].

Accordingly, the Motion to Exclude Harris is **DENIED** insofar as Plaintiffs seek to preclude Mr. Harris from testifying regarding **Opinions # 1 to #5**.

### B. Opinions Referencing the Conclusions of Others: Opinions #6 and #7

Next, Plaintiffs claim that Mr. Harris made two opinions by relying on the expertise of others and "us[ing] them to support his own opinion, which lacks scientific validity." [Doc. 72 at 6]. Those opinions are as follows:

> **Opinion #6:** "The faulty flame arrester was too small[.]" [Doc. 72-1 at 5, ¶ 2]; *see also* [*id.* at 3 ("[T]he flame arrester was too small for this application.")].
>
> **Opinion #7:** "The flare was too big." [*Id.* at 3; *id.* at 5, ¶ 2].

[Doc. 72 at 6].

With respect to Opinions #6 and #7, the Parties primarily dispute Mr. Harris's methodology in forming his conclusions regarding the sizes of the flame arrester and the flare. *See* [*id.* at 6–9; Doc. 75 at 6–10; Doc. 78 at 3–5]. Specifically, Plaintiffs identify two purported "experts" whom they claim Mr. Harris improperly relied upon in reaching his conclusions. The first is "an unnamed OSHA investigator" who, according to Plaintiffs, did not "state that the flame arrestor[9] was faulty or too small, or that the incinerator was too big." [Doc. 72 at 7].[10] The second is "Defendant BHS, Inc.'s manager at the time of the explosion, Garrett Mitchell, who was responsible for delivering the tanks in a safe condition." [*Id.*]. Plaintiffs assert that Mr. Mitchell was "not disclosed as an expert witness with expert opinions, but he is the key fact witness for Defendant BHS." [*Id.*].

Plaintiffs also cite excerpts from Mr. Harris's deposition testimony to support their position that Mr. Harris did not independently investigate to determine the size of the flame arrester or the flare, but, instead, relied on the unnamed OSHA investigator and Mr. Mitchell. *See* [*id.* at 6–9

[9] The Parties' arguments and their documents sometimes use different spellings for this term—i.e., "arrester" versus "arrestor." When quoting the Parties or their documents, the Court will use the spelling as used in the quotation, without noting any corrections.

[10] Plaintiffs claim that "[n]owhere in their hundreds of pages of OSHA reports does any investigator state that the flame arrestor was faulty or too small, or that the incinerator was too big." [Doc. 72 at 7].

(citing [Doc. 72-3 at 61:23–62:21, 70:6–20, 79:11–20, 87:21–88:21, 90:18–21])].  For instance, they cite the following testimony:

> **Q.  You know, in your discussion you say that the flame arrester was too small. What size was this flame arrester supposed to be?**
>
> A.  I don't -- I don't really know.  You know, it's something that OSHA mentioned. It's -- it's something that Garrett Mitchell mentioned.  I'm not actually a flowback engineer.  I'd have to -- I'd have to do some research, get some smarter people in that area than me.  But that's what I heard.

[Doc. 72-3 at 61:23–62:6].  Plaintiffs contend that "allowing Mr. Harris, as a chemical engineer[,] to stamp his . . . approval on opinions that he hasn't researched himself is misleading and improperly bolsters the testimony of others that hold those opinions."  [Doc. 27 at 9].  According to Plaintiffs, "[t]his is not a scientifically valid methodology as contemplated by *Daubert*."  [*Id.*].

Defendant responds that Mr. Harris's assertions regarding the size of the flame arrester and flare are "based on his investigation of the flame arrestor, not solely on other expert's [sic] opinions."  [Doc. 75 at 6 (capitals omitted)].  For support, Defendant cites excerpts from Mr. Harris's deposition reflecting, *inter alia*, that when "asked if he was deferring to other experts" to support his conclusion, Mr. Harris responded, "[n]o," and he explained that he was also relying on evidence "that the flame arrester was melted on the outlet side" and that it had "overheated."  [Doc. 72-3 at 80:2–18]; *see also* [Doc. 75 at 6–7].  Defendant also references other portions of Mr. Harris's testimony that purportedly establish that Mr. Harris's opinions are "based on his <u>own</u> expertise, his <u>own</u> investigation of the damage to the flame arrester, and the testing of a similar flame arrester" to conclude that "improper sizing of the flame arrester and the flare led to flames on the outlet side of the flame arrester."  [Doc. 75 at 7 (citing [Doc. 72-3 at 62:7–13, 63:25–64:2, 67:20–25, 77:2–4, 87:11–16])].  Defendant further argues that Plaintiffs mischaracterize Mr. Harris's deposition testimony to support their position that he relied upon the opinions of others in forming his own conclusions.  *See* [*id.* at 8 ("The testimony relied upon in the Motion regarding

Mr. Harris' reliance on others is ultimately a red herring. . . .  The core of Mr. Harris'[s] opinion is that these sizes <u>did not</u> match, resulting in damage to the flame arrestor.  Thus, the 'proper' size is irrelevant.  As a result, the fact Mr. Harris would have to perform additional research to determine the 'proper' sizes does not impact the reliability of his opinions.")].

The Federal Rules of Evidence permit an expert to rely upon facts or data that he has been made aware of or personally observed, or are of a type reasonably relied upon by experts in the field, Fed. R. Evid. 703, but "[c]ourts around the country have held that the rules do not permit an expert to rely upon opinions developed by another expert for purposes of litigation without independent verification of the underlying expert's work." *City of Las Cruces v. Lofts at Alameda, LLC*, 618 F. Supp. 3d 1192, 1196 (D.N.M. 2022).  The Court declines to preclude Mr. Harris from testifying as to the size of the flame arrester and flare at this time.  Indeed, the sizes of the flame arrester and flare apparently relate to his opinion regarding the cause of the explosion.  As noted above, the proponent of an expert witness "need not prove that the opinion is objectively correct, but only that the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used[,] and that the methodology was otherwise reliably applied." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008) (citation omitted).

The relevant question is whether Mr. Harris's reliance upon others' assertions regarding the sizes of the flame arrester and flare was part of an appropriate, reliable method for reaching his conclusions regarding causation.  To the extent that Mr. Harris seeks to testify as to objective facts and data ascertained by others as underlying his opinions—e.g., the flame was a particular size, or that he establishes in testimony that he independently verified the other expert's work—this Court will permit him to do so.  But to the extent that Defendant contends that Mr. Mitchell is "a former

BHS employee [who] has been involved in the oil & gas industry for over 20 years," and "the belief of an individual experienced in the oil & gas industry is the type of evidence experts in the field would typically rely upon," [Doc. 75 at 9], this Court respectfully disagrees.  Whether Mr. Mitchell is qualified to opine regarding the size of the flame arrester and flare is not relevant. Whether Mr. Harris can, in turn, rely upon that opinion is dependent upon what foundation Mr. Harris can lay in his testimony.  *See Hutchinson v. Groskin*, 927 F.2d 722, 725 (2d Cir. 1991) (explaining that an expert witness cannot be used "as a conduit for hearsay testimony").

Accordingly, the Motion to Exclude Harris is **DENIED** insofar as Plaintiffs seek to preemptively preclude Mr. Harris's testimony as to **Opinions #6 and # 7**, but ruling on their admissibility is **RESERVED** for trial.

### C.    Opinions Regarding the Oil and Gas Industry Standard of Care: Opinions #8 and #9

Plaintiffs next contend that Mr. Harris is unqualified to render the following opinions regarding the standard of care in the oil and gas industry:

> **Opinion #8:** "The Skyline employees were responsible for making sure there were no openings in the tanks."  [Doc. 72-1 at 5, ¶ 7].

> **Opinion #9:** "Skyline employees should have recognized the dangerous condition and used their 'Stop Work' authority."  [*Id*. at ¶ 12].

[Doc. 72 at 9–11].  Defendant disagrees, arguing that Mr. Harris's experience in the oil and gas industry relates specifically "to the cause of fires and explosions," and that experience has led Mr. Harris to "develop[] expertise in the actions and responsibilities that would <u>prevent</u> fires and explosions at oil & gas sites."  [Doc. 75 at 10].  For support, Defendant points to, *inter alia*, Mr. Harris's testimony that in "more than two-thirds of [his] oil and gas well cases, they're always saying why didn't you use your stop-work authority?" and "[i]f more people would just use their stop-work authority at the appropriate time, the incident wouldn't happen.  It happens all the time.

More often than not with these explosions." [Doc. 72-3 at 193:6–22]. Based on this testimony, Defendant contends that "Mr. Harris has expertise in when and how stop[-]work authority should be used at oil & gas sites." [Doc. 75 at 10–11].

The Court declines to preclude Mr. Harris from testifying regarding Opinions #8 and #9. As previously mentioned, where an expert's testimony is based on experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Medina-Copete*, 757 F.3d at 1104. Mr. Harris's testimony regarding his extensive experience investigating explosions and related safety concerns in oil and gas sites provides such an explanation. *See, e.g.*, [Doc. 72-3 at 193:14–22]; *see also* [Doc. 72-2].

Plaintiffs acknowledge that Mr. Harris "has analyzed explosions at oil/gas well sites," but argue "these were all within the context of his experience related to origin and cause determination of fires," and "Mr. Harris does not have specific certifications or training in oil and gas fires explosions, and he is not a petroleum engineer." [Doc. 72 at 10]. Plaintiffs also claim, *inter alia*, that Mr. Harris is inexperienced in flowback operations. [*Id.* (arguing that "Mr. Harris provides opinions that require expertise on the oil and gas industry standards for flowback operators and storage tanks")]; *see also* [Doc. 78 at 6 ("[S]imply being on oil and gas sites after an explosion or fire to conduct a forensic investigation does not qualify him for opining on the standard practices for companies operating on flowback sites.")]. However, Plaintiffs fail to explain, for instance, how Mr. Harris's alleged inexperience with flowback operations specifically renders inadmissible his experience-based opinions regarding safety-related causation forensics at oil and gas well sites generally. Again, the Court finds that Plaintiffs' arguments raise challenges to Mr. Harris's data and/or assumptions, but do not address his methodology, and thus go to the weight, rather than the

29

admissibility, of Mr. Harris's opinions regarding the general standard of care in the oil and gas industry.  *See Hardy*, 2011 WL 5295199, at *3.

Accordingly, the Motion to Exclude Harris is **DENIED** insofar as Plaintiffs seek to preclude Mr. Harris from testifying regarding **Opinions #8 and #9**.

### D.      Opinions Plaintiffs Claim Mr. Harris Has "Withdrawn": Opinions #10 to #12

Finally, Plaintiffs seek to preclude Mr. Harris from testifying regarding three opinions that he purportedly "withdrew" at his deposition.  [Doc. 72 at 11–12].  Those opinions are as follows:

> **Opinion #10:** "This explosion was caused by a faulty flame arrester."  [Doc. 72-1 at 5, ¶ 1].
>
> **Opinion #11:** "The flame arrester was 10 years old and faulty.  This condition was likely present before it was installed on this system."  [*Id*. at ¶ 8].
>
> **Opinion #12:** "The damaged flame arrester was not properly inspected by Cross Energy or Skyline, (it's [sic] owner), and should not have been used."  [*Id.*].

[Doc. 72 at 11–12].  For support, Plaintiffs cite portions of Mr. Harris's deposition testimony stating, *inter alia*, that he was withdrawing his opinions that "the flame arrester was ten-years-old and faulty," as the flame arrester was manufactured in 2019; and confirming there was "[n]o need to inspect the brand new flame arrester."  [*Id.* (citing [Doc. 72-3 at 81:20–82:4, 83:14–21])].

Defendant responds that Mr. Harris only "withdrew his opinion that the flame arrester was old, his opinion that it was improperly inspected, and his opinion that it was faulty at the time it was installed."  [Doc. 75 at 11–12 (citing [Doc. 72-3 at 82:12–14])].  Defendant disagrees, however, that Mr. Harris withdrew his opinions regarding the general faultiness of the flame arrester, arguing that, at his deposition, "Mr. Harris made clear that he believed the flame arrester 'is faulty now, and it was faulty when the explosion occurred.'"  [Doc. 75 at 12 (citing [Doc. 72-3 at 86:1–13])].  Defendant also points to Mr. Harris's testimony that faults with the flame arrester "allowed the ignition source from the flare to get into the venting system and explode the tanks."

[Doc. 72-3 at 85:5–21].  On Reply, Plaintiffs cite additional testimony by Mr. Harris reflecting that "the flame arrestor only melted because of other problems in the system, rather than any defects or faults of the flame arrestor itself."  [Doc. 78 at 7 (citing [Doc. 72-3 at 91:9–92:8])].

In light of Defendant's concession that Mr. Harris withdrew his opinions that the flame arrester was old, improperly inspected, and was faulty at the time it was installed, [Doc. 75 at 11–12], the Court finds it proper to preclude Mr. Harris from testifying on these subjects.  However, the Court disagrees that Mr. Harris should be precluded from testifying regarding the general faultiness, if any, of the flame arrester.  Indeed, as noted above, Plaintiffs and Defendant both rely upon Mr. Harris's testimony to support their positions, but that testimony does not clarify one way or the other whether Mr. Harris indeed believed the flame arrester was faulty.  *Compare, e.g.*, [Doc. 72-3 at 86:10–13 ("There is no evidence that the flame arrester was faulty when it was purchased. However, it is faulty now, and it was faulty when the explosion occurred.")] *with* [*id.* at 87:14–16 ("I don't specifically know [whether the flame arrester was too small], but I know the system was operating improperly if there was flames on the outlet side of the flame arrester.")].

Moreover, given that Plaintiffs do not challenge Mr. Harris's methodology in determining whether the flame arrester was generally faulty, *see* [Doc. 72; Doc. 78], Plaintiffs' criticisms here go to the weight of Mr. Harris's opinions, not admissibility.  *See Hardy*, 2011 WL 5295199, at *3. Plaintiffs will have an opportunity at trial to challenge Mr. Harris's opinions regarding the faultiness of the flame arrester, including to cross-examine Mr. Harris's testimony and point out any inconsistencies or flaws.  To the extent Plaintiffs conclude that Mr. Harris's ultimate opinions are incorrect, this Court notes that Defendant need not prove, in the context of a *Daubert* challenge, that Mr. Harris "is [in]disputably correct or that [his] theory is 'generally accepted' in the scientific community."  *Dodge*, 328 F.3d at 1222; *Two Moms & a Toy*, 2012 WL 5249459, at *5 ("[t]ypically,

to determine the reliability of expert testimony, courts do not focus on the correctness of the opinion"). Because the Court finds that Plaintiffs' criticisms go to the weight, not admissibility, of Mr. Harris's opinions, the Motion to Exclude Harris is **GRANTED** insofar as Plaintiffs seek to preclude Mr. Harris from testifying that the flame arrester was old, improperly inspected, and was faulty at the time it was installed; and **DENIED** in all other respects as to **Opinions #10 to #12**.

<div align="center">

**CONCLUSION**

</div>

For the foregoing reasons, **IT IS ORDERED** that:

(1)   The Motion to Exclude Certain Testimony by Expert Barry A. Cole at Trial [Doc. 71] is **GRANTED IN PART and DENIED IN PART** as set forth herein;

(2)   The Motion to Exclude Certain Testimony by Defendant BHS, Inc.'s Expert Randolph J. Harris at Trial [Doc. 72] is **GRANTED IN PART and DENIED IN PART** as set forth herein; and

(3)   The Final Pretrial Conference scheduled for **May 23, 2023 at 10:00 a.m.** and associated deadlines **REMAIN SET**.

DATED:  May 12, 2023                                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge